IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. |
| *v.* | 1:06-CR-147-01-ELR |
| SYED HARIS AHMED | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO AHMED'S MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE**

Comes now the United States of America, by Kurt R. Erskine, Acting United States Attorney, and J. Elizabeth McBath and Katherine M. Hoffer, Assistant United States Attorneys for the Northern District of Georgia, and respectfully submits this opposition to Ahmed's motion for early termination of supervised release. Ahmed's motion asks this Court to end his supervised release an entire 26 years earlier than the trial judge ordered. The Court's original order should be honored, and Ahmed's premature request, denied.

## BACKGROUND

### 1.  Ahmed's Offense Conduct

On June 10, 2009, after years of litigation involving  hundreds of pleadings and motions utilizing classified information, Ahmed was convicted after a bench trial before the Honorable William S. Duffey, Jr., of conspiracy to provide material support to terrorists, in violation of 18 U.S.C. §§ 2339A(a), 956 and 2332b. (Doc. 509). On December 15, 2009, the

district court sentenced Ahmed to 13 years' imprisonment, to be followed by a 30-year term of supervised release. (Doc. 620). Ahmed began his supervised release just four years ago, on August 11, 2017.

The case against Ahmed started when law enforcement agents in the United Kingdom found videos of various Washington, D.C.-area buildings on the computer of Younis Tsouli, a suspected terrorist.[1] (Doc. 305 at 3). These videos were made and distributed by Ahmed and codefendant Sadequee. (Doc. 305 at 3). European law enforcement shared this information with the FBI's Joint Terrorism Task Force. (*Id*.).

Upon investigating, agents discovered an online email folder that Ahmed and Sadequee used to communicate with each other. (Doc. 305 at 30, 58). Their email communications discussed the two's desire to engage in jihad, and they exchanged writings and articles about violent jihad, as well as information about publications that promoted jihad. (Doc. 510 at 2-3). Sadequee posted private messages on a jihadist web forum to communicate with a known terrorist and a member of a known federal terrorist organization, "Lashkar-e-Tayyiba." [2]  (Doc. 510 at 6-8), and Ahmed and

---

[1] Tsouli was the administrator of Al-Ansar forum, a private online forum dedicated to the cause of violent jihad. (Doc. 510 at 13). Tsouli used the forum to identify potential suicide bombers and put them in touch with Al Qaeda recruiters. (Doc. 510 at 13). In addition to Ahmed and Sadequee's videos, Tsouli's computer also had material relating to violent jihad, including videos about explosives, hostage beheadings, improvised explosive device, and suicide attacks, as well as a variety of Al Qaeda media productions. (Doc. 510 at 13).

[2] This is an organization based in Pakistan that commits violent attacks to further the goal of removing control of Kashmir from non-Muslims,

Sadequee together formulated a three-step plan that would culminate in violent jihad in the United States. (Doc. 510 at 2-3).

The two met Canadian "brothers" (supporters of violent jihad) online. (Doc. 305 at 7-8; Doc. 510 at 3). They They planned (and executed) a trip to Canada to meet some of them in person. (Doc. 510-3). While in Canada, Ahmed discussed the idea of attacking American oil storage facilities and refineries or a military base, and also discussed attacking the satellite system that controls the global positioning system (GPS).[3] (Doc. 305 at 7-8, 37-38). Ahmed further discussed with his Canadian "brothers" how they could obtain military-style jihadi training, and how easy it is to smuggle guns into the United States compared to Canada. (Doc. 305 at 37-38). The group agreed on a plan for them to travel to Pakistan to obtain paramilitary training so that they could "engage in attacks to cause serious injury or death to others." (Doc. 510 at 4).

But to be accepted into a paramilitary training camp, Ahmed knew that he first "had to establish credibility with supporters of violent jihad." (Doc. 510 at 5). To do that, Ahmed developed a plan to go to Washington, D.C. to create surveillance videos of national landmarks. (Doc. 510 at 5). So one month after returning from Canada, Ahmed and Sadequee set off for

---

including having joined in attacks on United States soldiers in Afghanistan. (Doc. 510 at 8).

[3] Upon returning from Canada, Ahmed and Sadequee ultimately identified Dobbins Air Force Base in Marietta, Georgia, as a good target for their violent jihad. (Doc. 510 at 4).

Washington, D.C., where they spent two days creating 62 videos, which included videos of the United States Capitol; the World Bank; the Masonic Temple in Alexandria, Virginia; and fuel storage tanks in Virginia. (Doc. 510 at 5). It was these videos that ultimately made their way to Tsouli's computer in Europe. (Doc. 305 at 7-8). Indeed, Ahmed ultimately admitted to agents that he and Sadequee traveled to Washington, D.C. for the purpose of making surveillance videos of various national landmarks, which they planned to (and, in fact, did) send to the "jihadi4 brothers" — or extremists — overseas, in helping them prepare for an attack against the United States. (Doc. 305 at 7-8).  In Ahmed's words, he and Sadequee wanted to "be spies for the people over there." (Doc. 305 at 7-8).

 After his D.C. trip, Ahmed next began coordinating entering a training camp in Pakistan, and even chatted directly with Aabid Hussein Khan —  a recruiter for Jaish-e-Mohammed[4] — about what Ahmed needed to do to gain admission into a training camp. (Doc. 510 at 7-8, 10). Sadequee used this contact with Khan to email him the Washington, DC. videos.[5] (Doc. 510 at 9).

Ahmed ultimately traveled to Pakistan in the summer of 2005 to fulfill his dream of being recruited into a jihadi training camp. (Doc. 305 at

---

[4] This organization is responsible for suicide and other violent attacks in Kashmir and elsewhere. (Doc. 510 at 8).

[5] In addition to Tsouli's computer, law enforcement also discovered Ahmed and Sadequee's videos on Khan's computer, where they had been saved in a folder entitled "Intelligence." (Doc. 510 at 9).

7-8). He admitted that he went to Pakistan to train "for the jihad and the good of Islam." (Doc. 305 at 37; Doc. 510 at 7). While there, he also hoped to recruit others to help him with his terrorist agenda. (Doc. 305 at 30). In his own words, he hoped that the military training he received would help him die "a martyr." (Doc. 305 at 37).

Back home from Pakistan, Ahmed continued to research explosives, methods to defeat SWAT teams and special operations units, and how to encrypt messages. (Doc. 510 at 12).

Once under investigation, Ahmed repeatedly gave untruthful answers to law enforcement, failed to disclose an email account that he had to the FBI, and emailed Sadequee (who was then living in Bangladesh), telling him of the FBI interviews and instructing him not to return to the United States. (Doc. 510 at 8-9).

## 2.  Sentencing Hearing

Throughout the investigation, trial, and sentencing, Ahmed showed no remorse.  The sentencing judge recognized this, and, in fashioning its sentence, relied heavily on the trial evidence. The Court stated, "I will make my own decision, because I know the facts in the case because I have now presided over two trials, and I have since the trials  reviewed independently the evidence that was admitted . . . ." (Doc. 645 at 9).

And that evidence defeated Ahmed's arguments for a lenient sentence. Specifically, Ahmed argued — as he does now — that he was young and manipulated. The Court responded to that argument this way:

> You say what happened in the past is in the past. You know, when I started this case and your very capable lawyers, who you have

> decided not to use, began to try to paint this picture of somebody
> who was young and naïve and somehow impressionable and
> manipulated, I was open to the prospect that that might be true. I was
> open to the prospect and the possibility that somebody at your age
> may well have, while adopting distorted views, may at some point
> have decided that they were errant and rejected them. But what I
> have seen through the course of these  trials and what I see today is a
> myopic, self-interested person who seeks to achieve what you want
> to achieve at the cost of other people.

(Doc. 645 at 61). Indeed, the Court characterized Ahmed's arguments as the
defendant trying to "further manipulate me into a sentence," and
responded, "I'm not going to allow you to do that either, because I'm going
to do what I think is my job. Because I trust my country and its values, and
in pursuing them in reaching my conclusion about this sentence and
considering all of the criteria that I'm supposed to, I think the sentence that
I have decided upon is in fact what's fair not only to you, but it's fair to my
country." (Doc. 645 at 65-66).

The Court continued its reason for the sentence, which included both
specific and general deterrence:

> It's my responsibility to evaluate what a fair sentence is, and a fair
> sentence is one that addresses two I think overriding principles. I am
> convinced now more than ever that you personally need to be
> deterred. And I am as certain that others like you — we don't know
> where they are, but we know that they eventually emerge — to let
> them know that what you wanted to do and what plan you put into
> place and the steps that you took are going to be dealt with harshly
> and severely, and that it's not worth the risk.

(Doc. 645 at 65-66). Finally, the Court specifically noted the importance of
Ahmed's 30-year supervised release term: "I have tried to craft a sentence

that allows appropriate authorities to monitor your conduct after you are released from prison." (*Id.*).

### 3. Two Years In, Ahmed Asks that His  Supervised Release Terms Be Modified

On August 11, 2017, after Ahmed served his term of imprisonment, he was released to begin his supervised release. Only two years later, though, Ahmed filed a petition requesting a modification of his supervised release such that he be allowed Internet access. (Doc. 655). On December 17, 2019, this Court granted Ahmed access to the Internet. (Doc. 667).

On July 2, 2020, the Probation Officer filed a petition, asking that it be allowed to monitor Ahmed's Internet usage. (*See* Exhibit A). In support of this petition, the United States Probation Office explained that computer and Internet monitoring was imperative given the seriousness of Ahmed's convictions. (*Id.*). On July 13, 2020, this Court denied the Probation Officer's request in its entirety. The government moved for reconsideration, which this Court denied on October 30, 2020. (Docs. 668, 670).

### 4. Now, Only Four Years In, Ahmed Asks that His Supervised Release Be Terminated In Its Entirety

On April 30, 2021 — only four years after he began his 30-year supervised release term — Ahmed asks this Court to terminate it completely.

## ARGUMENT

Ahmed asks that his supervised release be terminated entirely. In doing so, he recycles the arguments he made at the sentencing hearing as well as puts forth arguments that do not compel the conclusion he seeks.

Under 18 U.S.C. § 3583(e), this Court may terminate supervised release after a defendant has served one year, but only if, after considering certain of the 18 U.S.C. § 3553(a) factors, the Court "is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." Ahmed's conduct does not warrant early termination of supervised release, and the interests of justice require that this Court deny Ahmed's motion.

All of Ahmed's arguments in support of his motion fail. First, Ahmed asserts that, when he conspired to provide material support to terrorists, he "was young, impressionable and vulnerable," but that "[t]oday, he is older, wiser and with a much better understanding of what his religion means and requires, and what it does not." (Def. Mot. at 7). This is, however, the same argument that Ahmed made at sentencing — the one that was flatly refuted by the trial and sentencing judge. And even if it is true that Ahmed has changed during the time he served in prison, no one can be certain given that Ahmed has served only 13% of his supervised-release sentence. Indeed, the mere fact that Ahmed would move this Court to terminate his supervised release after he has served only 4 years of a 30-year term suggests otherwise; that is, it seems to suggest a sense of entitlement and lack of understanding and respect for the offense he committed and sentence the judge imposed.

Second, Ahmed's request to terminate supervised release so that "he may continue to pursue his personal ambitions . . . and help others learn from his mistakes," (Def. Mot. at 10), lacks merit because nothing about being on supervised release would hamper his efforts in this regard. While he must receive Probation Office approval to travel, such an impediment is hardly too burdensome, especially when compared to the seriousness of the crime and how it was committed (which included by traveling). As to Ahmed's point about being able to vote, his crime aimed at destroying this country and its citizens forfeited that right.

While Ahmed cites a study examining the recidivism rate among those convicted of terrorism offenses, that study is focused on whether long-term government surveillance is necessary. This is not the question here. Plus, the article itself recognizes that the reported recidivism rate may be because "[p]erhaps political offenders are better at disguising their activities the second time around. In other words, upon release they may reoffend at rate comparable to or greater than apolitical offenders but do so with greater care and caution so as to make their activities less discernable to legal authorities." (Def. Mot. at Ex. 8, p. 61). We simply don't know. Nor should we take that chance. This Court should honor the sentencing judge's original sentence, recognize the seriousness of Ahmed's offense, and protect our country and its people. Ahmed's motion would be denied.

## CONCLUSION

Based upon the foregoing, the Government requests that this Court deny Ahmed's motion for early termination of supervised release.

This 21st day of May, 2021.

Respectfully submitted,

KURT R. ERSKINE
*Acting United States Attorney*

/s/ J. Elizabeth McBath
Assistant United States Attorney
Georgia Bar No. 297458
Elizabeth.mcbath@usdoj.gov

/S/ KATHERINE M. HOFFER
*Assistant United States Attorney*
Georgia Bar No. 045737
katherine.hoffer@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

May 21, 2021

/s/ J. Elizabeth McBath

ASSISTANT UNITED STATES ATTORNEY